355 F.2d 900
 OUTAGAMIE COUNTY, WISCONSIN, City of Appleton, Wisconsin, Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent.
CITY OF CLINTONVILLE, WISCONSIN, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
CITY OF ASHLAND, WISCONSIN, County of Ashland, Wisconsin, Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent.
STATE OF WISCONSIN, Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent.
Winnebago County, Wisconsin, City of Oshkosh, Wisconsin,
North Central Airlines, Inc., Intervenors.
 Nos. 14994-14997.
 United States Court of Appeals Seventh Circuit.
 Jan. 18, 1966.
 
 Gerald P. O'Grady, Washington, D.C., A. W. Ponath, Appleton, Wis., Jack D. Steinhilber, Flanagan, Steinhilber & Chaney, Oshkosh, Wis., Robert C. Lester, Washington, D.C., Howard S. Boros, Washington, D.C., Robert W. Otto, Clintonville, Wis., John H. Doyle, Robert W. Alvord, Washington, D.C., Bronson C. La Follette, Atty. Gen., George B. Schwahn, Asst. Atty. Gen., Madison, Wis., Robert W. Alvord, Alvord & Alvord, Washington, D.C., Koepenick & O'Grady, Washington, D.C., of counsel, for petitioners.
 Frederic D. Houghteling, Atty., Joseph B. Goldman, Deputy Gen. Counsel, O. D. Ozment, Associate Gen. Counsel, Litigation and Legislation, C.A.B., Donald F. Turner, Asst. Atty. Gen., John H. Wanner, Gen. Counsel, C.A.B., Lionel Kestenbaum, Asst. Chief, Appellate Section U.S. Dept. of Justice, Washington, D.C., for respondent.
 Jerrold Scoutt, Jr., Washington, D.C., David M. .gooder, Charles H. Weiland, Chicago, Ill., Lear, Scoutt & Resenberger, Washington, D.C., Lord, Bissell & Brook, Chicago, Ill., of counsel, for intervenors.
 Before SCHNACKENBERG, CASTLE and KILEY, Circuit Judges.
 KILEY, Circuit Judge.
 
 
 1
 The petitioners seek to have this court review[1] and set aside a Civil Aeronautics Board order[2] designating various single airports to serve two cities where previously each city had its own. This court permitted Winnebago County and the City of Oshkosh, Wisconsin, and North Central Airlines, Inc., to intervene. We affirm the order reviewed, and deny the petitions.
 
 
 2
 The challenged order arose out of the North Central Area Airline Service Airport Investigation,[3] which was instituted by the Board June 29, 1962, to determine, among other things, whether North Central's service should be provided through consolidated single airports at certain 'pairs of points.' Among these pairs were Clintonville-- Green Bay, Wisconsin; Ashland, Wisconsin-- Ironwood, Michigan; and Appleton-- Oshkosh, Wisconsin. The hearing examiner decided that each point in these 'pairs' should retain, for the time being, its own airport. The Board reversed the examiner's decision and ordered that North Central's certificate of conveience and necessity be modified, in effect, to provide consolidated air service for the 'pairs' at single airports in Green Bay, Ironwood and Oshkosh, and that its air service be abandoned at Ashland, Clintonville and Appleton.[4] The petitions before us followed.
 
 I.
 
 3
 We think it is fair to state that all claims in the various petitions fall under two basic contentions: that there is no sufficient evidentiary basis for the Board's findings, which in themselves are inadequate and from which the Board drew unwarranted conclusions; and that the Board's decision failed to apply the statutory criteria properly, and is arbitrary since it is not founded on intelligible standards and is inconsistent with other decisions and policies of the Board and with controlling judicial precedent. Broader contentions are also made which we shall refer to hereinafter.
 
 
 4
 The Board 'upon its own initiative' under 49 U.S.C. 1371(g) instituted the pertinent investigation to determine whether the 'public convenience and necessity' required alteration or amendment of North Central's certificate so as to provide service through a single airport for any of the three 'pairs' of cities before us. In performing its duties the Board is required to consider, among other things, several factors or matters as 'being in the public interest, and in accordance with the public convenience and necessity.'[5]
 
 
 5
 The order instituting the investigation[6] outlined the Board's purpose of determining whether consolidation of services to two separate cities at a single airport would, 'without substantial inconvenience to the air passengers,' produce overall area air service improvement by more economical operations, improved schedules and better service with larger planes. It stated that the distance between the paired cities would be the Board's 'initial reference point,' and that its initial focus had been on the 'pairs' within fifty miles of each other, but later other considerations had been given 'greater weight.' The order also stated that, 'only' as investigative and decisional guidelines, 'certain fundamental factors * * * will be studied.' These factors were set out: Airport Accessibility; Traffic; Airport Capabilities; and Cost.
 
 
 6
 The Administrative Procedure Act, Section 8(b), 5 U.S.C. 1007(b), requires that decisions of the Board include the findings, conclusions and reasons therefor, and under Section 10(e), 5 U.S.C. 1009(e), the findings and conclusions shall be set aside if unsupported by substantial evidence.[7]
 
 II.
 
 7
 In the Ashland-Ironwood 'pair' the examiner found each city 'heavily dependent' upon air service for student, business, industrial and tourist transportation, and both 'depressed areas' with deteriorated surface transportation and in need of air service to stimulate growth, especially of light industry and tourism. The Board agreed that Ashland passengers would be inconvenienced, but since Ashland was historically only a marginal generator of passenger traffic, the inconvenience would be 'relatively minor.' It found, however, that at Ironwood, about 45 miles and less than an hour away over an adequate road, the principal direction of traffic flow was to Chicago and for most Ashland passengers no 'back-haul'[8] problem existed, and that although 'some unfavorable impact' on Ashland's economy might result from abandoning service at its airport, the adverse effect would not be significant.
 
 
 8
 Against these considerations the Board weighed the annual savings of about $28,000.00 to North Central, the subsidy savings of the federal government, and the obviation of an expenditure of $171,765.00 for airport improvement at Ashland, and concluded that consolidation of air service at Ironwood was required 'in the public interest, and in accordance with public convenience and necessity.'[9]
 
 III.
 
 9
 As to the Clintonville-Green Bay 'pair,' the Board stated that the examiner's determination rested essentially on the 'preponderant weight' given to the factors of the air cargo generated at Clintonville, the adequacy of surface transportation, the effect of loss of air service upon Clintonville's industrial growth, and North Central's financial history from its Clintonville operations. The Board agreed that Clintonville's record as a generator of air cargo was properly accorded 'considerable' weight, but stated that the other factors did not weigh as heavily in its judgment as they did in the examiner's.
 
 
 10
 The Board found that Clintonville failed to generate an average of five passengers per day for a decade, and that the trend has remained 'relatively static'; that despite air service at Clintonville, about 41% Of its air travelers use the Green Bay airport, 'undoubtedly' because of the frequency of flights and superiority of equipment there, and that that fact discounts the weight to be given to a claim of inaccessability of the Green Bay airport; that consolidation of service at Green Bay would reduce the North Central subsidy need by more than $30,000.00 per year and obviate the expenditure of over $300,000.00 to improve the Clintonville airport; and that the consolidation would not have the 'dampening effect' on Clintonville's economy predicted by the examiner. In sum the Board found that on 'balance' the public interest factors justified requiring that Clintonville be served through an area airport.
 
 IV.
 
 11
 With respect to the Appleton-Oshkosh 'pair,' the examiner thought the ideal solution was a new area airport in the vicinity of Neenah, Wisconsin. But since Oshkosh (Winnebago County) and Appleton (Outagamie County) were unable to agree on this and since the FAA had given clearance to the proposed Outagamie County (Appleton) airport, the examiner decided that Oshkosh should continue to receive North Central service at its Winnebago County airport, and that Appleton should continue receiving service at its present airport and at the new Outagamie County airport when it is constructed.
 
 
 12
 The Board found that 80% Of the Appleton-Oshkosh area's passengers enplaned at Oshkosh, and 85% Of the area cargo and 90% Of its airmail used the Oshkosh airport; that North Central's 'break-even need' would be improved by $34,155.00 by consolidation at Oshkosh; that 'only' a $170,000.00 expenditure would enable Winnebago County to bring the airport up to FAA design standards required for more beneficial equipment (i.e., Convair 340/440 aircraft); that the cost of completing the proposed new Outagamie airport 'may be' eliminated in substantial measure;[10] that the inconveience to Appleton traffic would not be significant and would, in any event, be offset by better service and financial advantages; that there would be no 'back-haul' for Appleton passengers traveling to the Winnebago airport about 26 miles and 35 minutes away; that about 71% Of Appleton/Neenah/Menasha passengers now travel to the Winnebago airport rather than use the Appleton airport; that if the Outagamie County airport were selected as the area airport, North Central would probably lose a substantial number of passengers now boarding at Oshkosh, who would instead drive to Milwaukee or Chicago; and that North Central's subsidy need would be increased by an estimated $68,000.00.
 
 V.
 
 13
 Petitioners each challenge the Board's action as being arbitrary with respect to the standards used, the factors considered, and the weighing of the various circumstances which underlie the factors. We are not persuaded that the Board did not give due consideration to all of the relevant statutory criteria in section 1302. With respect to the factors considered and the weight attributed to various circumstances in weighing the factors, we think that the Board is not required in every case to weigh in the balance all of the possible factors that may be considered, and to make findings with respect to all of the circumstances upon which testimony has been given. For example, there is the instance where the 'Use It or Lose It' policy[11] of the Board has not been lived up to. That circumstance may weigh heavily in the balance in one case but be missing from the scales completely in another balance. We have considered and found without merit the various challenges to the findings and conclusions of the Board, among others, that the circumstance of weather conditions was not weighed in the airport accessability factor, that consolidation would not result in improved service, and that disadvantages in and costs of surface transportation were not sufficiently considered. The estimated cost of $300,000.00 for improving the Clintonville airport is challenged. Even if based only on 'FAA recommendations and design standards' and not on requirements, and even if the estimate is not realistic today, there is no contention that some improvement is not needed now or that more will not be needed 'tomorrow.' And the finding of an estimated saving of $30,000.00 to North Central in deleting service at Clintonville is unchallenged.
 
 
 14
 We think that the Board was not compelled on this record to continue service at the present Appleton airport until the new Outagamie airport, then under construction, was available. The Board did not accept Appleton's claim that this new airport would draw far more passengers than its old airport. The new airport is north and west of the source of most of that area's traffic, which is bound south and east. The Board considered the alternatives of continuing service at both cities as at present, consolidation of service for both at the Winnebago airport, and consolidation at the new Outagamie airport. We cannot say it should have made a different choice from the one made.
 
 
 15
 Similarly, in determining that the economic impact on Ashland would not be significant, the continual failure of Ashland to generate the five-passengers-per-day 'Use It or Lose It' policy norm justifies the Board's finding;[12] the economy of Ashland does not seem to depend much on air travel. And the cost of surface travel to the marginal number of passengers would have little weight in relation to the costs of service and subsidy.[13]
 
 
 16
 The Board, in determining the public convenience and necessity, weighed and balanced the various relevant factors, such as the needs of each of the cities for local service, the probable reduction of government subsidy to North Central and North Central's more efficient service under the consolidations, and the volume of traffic generated and the inconvenience suffered by the passengers in the areas involved. The various competing interests must be balanced against the broad public interest in promoting and developing airline systems adapted to the present and future needs of the commerce of this country, its postal service and its national defense. Airport Comm'n of Forsyth County v. CAB, 300 F.2d 185, 187 (4th Cir. 1962); United Air Lines v. CAB, 198 F.2d 100, 107-108 (7th Cir. 1952).
 
 
 17
 We conclude that the findings are supported by substantial evidence in the record and that the conclusions were reached after considering competing interests under the relevant statutory criteria and balancing public loss with public gain. City of Lawrence v. CAB, 343 F.2d 583, 586 (1st Cir. 1965); Cf. Universal Camera Corp. v. NLRB, 340 U.S. 474, 490-491, 71 S.Ct. 456, 95 L.Ed. 456 (1951).
 
 VI.
 
 18
 There is no merit in the contention that the Board's decision is inconsistent with its 'Regional Airport Policy' and with its 'Use It or Lose It' policy, and with its disposition of the Winona, Minnesota-LaCrosse, Wisconsin issue in the very order before us.
 
 
 19
 The policies are Board-made and particularize the underlying statutory standards in 49 U.S.C. 1302 of 'public interest, and in accordance with the public convenience and necessity.' The Board's findings and conclusions here are not inconsistent with the policies, and it is clear that no single factor or 'policy' controls in each case. The 'Regional Airport Policy'[14] arose from a concern over the establishment of separate air carrier airports in cities sufficiently close together to be served by one airport, and cautioned that the use of two or more airports in cities too close together tended to diminish service, increase costs, and deteriorate schedules; that consolidation into one, in many cases, results in improved schedules and service with larger equipment; and that an important factor in consideration of grants of funds for airport construction would be the use of single airports saving money for the government and locality served with resultant improved service. And while the 'Use It or Lose It' policy was applied in the earlier Seven States Area Investigation[15] involving cities now before us, the Board in the instant investigation order made it plain that use of an airport by five passengers per day would not insure retention of a subsidized local air service, but would be a circumstance considered in determining that question. Likewise, failure to meet this minimum traffic requirement was relevant as a circumstance against retention of local service. The Board here, in finding that Appleton met the 'Use It or Lose It' requirement and that Ashland and Clintonville did not, was not inconsistent in ordering consolidation in all three instances, as this was not the sole criterial in any of these instances.
 
 
 20
 The Board's findings and conclusions disclose that the 'guidelines' laid down in the order of investigation before us were the framework within which the Board balanced the various factors shown by the record. The balancing of the factors involved in allowing Winona, in the Winona, Minnesota-LaCrosse, Wisconsin 'pair,' to maintain its own airport is not inconsistent with the Board's order concerning the 'pairs' of cities before us. That decision was within the same guideline framework but the facts there are different from those here. For example, although Winona is 36 miles and 55 minutes from LaCrosse, Appleton is 26 miles and 35 minutes from Oshkosh; there is no public limousine service between Winona and LaCrosse, while door to door service is available between Appleton and Oshkosh; few Winona passengers use the LaCrosse airport while a majority of Appleton area passengers use the Oshkosh airport; and there is no 'back-haul' for most of the Appleton area passengers in traveling to Oshkosh, but there would be a 'back-haul' for many Winona passengers en route to Minneapolis and points west.
 
 
 21
 We see no necessity of exemplifying the differing factual situations with respect to Ashland-Ironwood and Clintonville-Green Bay, nor of differentating varying situations in other areas of the country from he three 'pairs' of cities in the order we are passing upon. It is enough to say that the standards applied to the variable factors in the Seven States Area Investigation are the same as those applied here. We agree with the Board that it need not attempt to distinguish allegedly inconsistent decisions where the facts of the present case, as here, are not substantially identical to those of the prior case cited by a petitioner. The Board here carried out its administrative function according to the statutory requirements, with sufficient notice of the standards and its bases of decision in the relevant statutory provisions, the Regional Airport Policy, the order instituting this investigation, and in the pre-hearing discussion before the examiner of issues to inform petitioners of what they must be prepared to meet. The nature of the function of the Board requires flexibility, with changing determinations to meet changing conditions in development of an adequate Federal Aviation Program to supervise a fast developing national air line industry.
 
 VII.
 
 22
 Petitioners rely upon City of Lawrence v. CAB, 343 F.2d 583 (1st Cir. 1965), in support of their contention that the Board's failure to develop sufficiently specific standards requires setting aside the Board's order. The court there decided that the New Haven-Bridgeport portion of the case should be remanded because the Board failed to give intelligible reasons for its 'findings and conclusions,' as required by 5 U.S.C. 1007. There is not in the case before us, as there was in that case, 'prolific indifference' by the Board to the Regional Airport Policy, its 'earlier decisions' and to some extent the criteria relied on by the examiner; nor 'confusion' as to decisional guidelines; nor a Board decision 'without explanation (reversing) an earlier case involving essentially the same questions.' This portion of the decision in City of Lawrence has no application here.[16] We think the Board here did 'narrow, clarify and explain' the 'general directive' of public convenience and necessity in accordance with Judge Friendly's statement quoted in City of Lawrence, 343 F.2d at 587.
 
 
 23
 We have considered all the questions presented and have discussed those we deem necessary for decision. The petitions to set aside the Board's order are denied, and the order is affirmed.
 
 
 
 [1]
 See 49 U.S.C. 1486
 
 
 [2]
 Order No. E-21534, Nov. 24, 1964
 
 
 [3]
 Docket No. 13743
 
 
 [4]
 Although the Board's opinion and the certificate did not specifically name the airport to serve as the single 'area airport,' the Board did indicate the airports it expected North Central to serve, i.e., Green Bay, Ironwood and Oshkosh
 
 
 [5]
 Federal Aviation Act 102, 49 U.S.C. 1302
 1302. Consideration of matters in public interest by Board
 In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:
 (a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;
 (b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure the highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers;
 (c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;
 (d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;
 (e) The promotion of safety in air commerce; and
 (f) The promotion, encouragement, and development of civil aeronautics.
 
 
 [6]
 Order No. E-18533, June 29, 1962
 
 
 [7]
 The Board's findings of fact are conclusive if supported by substantial evidence, see 49 U.S.C. 1486(e)
 
 
 [8]
 Surface travel to airport in that direction opposite to intended air travel. 'Back-haul' was one consideration whih the Board had listed under its 'Traffic' factor in the guidelines stated in its order instituting this investigation
 
 
 [9]
 49 U.S.C. 1302
 
 
 [10]
 It appears that the new airport was constructed during the Board's investigation, and that, as the examiner stated, it would 'apparently be built for general aviation purposes * * * regardless of the decision in this case.'
 
 
 [11]
 This policy for continued use of subsidized local carrier services has been codified in the Board's 'Statements of General Policy,' 14 C.F.R. 399.11(d) (1965), and states that: 'In evaluating the continuing need for air service at any point * * * served by a local servic carrier, the Board will use the minimum traffic standard of five passengers (per day) as a guide line, regardless of the type or duration of an authorization.'
 
 
 [12]
 When Ashland was given a temporary 5-year certification in 1958, see Seven States Area Investigation, 28 C.A.B. 680 (1958), it was warned that it must achieve the 5-passengers-per-day minimum
 
 
 [13]
 The examiner noted that 'The Board's guidelines for decision * * * state that the traffic generated at a point would affect the weight given all other factors, suggesting that the smaller the traffic response, the less weight is to be given to consideration affecting airport accessability.'
 
 
 [14]
 Promulgated jointly by the F.A.A. and C.A.B. on May 2, 1961 (press release)
 
 
 [15]
 28 C.A.B. 680, 755-57 (1958)
 
 
 [16]
 Chief Judge Aldrich, dissenting from the majority's remanding action in City of Lawrence, 343 F.2d at 589-590, lucidly noted the problem faced by a reviewing court when confronted with the large number of complex factors involved in an area airport decision, and concluded: 'It must be that this is peculiarly a Board problem.'