361 F.2d 810
 CITY OF PONITIAC, MICHIGAN, and Pontiac Area Chamber of
Commerce, Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent, North Central Airlines,
Inc., Intervenor.
REED CITY, MICHIGAN, and Reed City Chamber of Commerce, Petitioners,
v.
CIVIL AERONAUTICS BOARD, Respondent, North Central Airlines,
Inc., Intervenor.
 Nos. 16582, 16583.
 United States Court of Appeals Sixth Circuit.
 June 17, 1966.
 
 Sherwin M. Birnkrant, Pontiac, Mich., for city of Pontiac, Mich., and others.
 Joseph C. Lynch, Reed City, Mich., for Reed City, Mich., and others.
 Robert L. Toomey, Acting Assoc. Gen. Counsel, Litigation and Legislation, Washington, D.C., for Civil Aeronautics Bd., O. D. Ozment, Deputy Gen. Counsel, Burton S. Kolko, Atty. Civil Aeronautics Bd., Donald F. Turner, Asst. Atty. Gen., Howard E. Shapiro, Atty., Dept. of Justice, Joseph B. Goldman, Gen. Counsel, Civil Aeronautics Bd., Washington, D.C., on the brief.
 Jerrold Scoutt, Jr., Washington, D.C., for North Central Airlines, Inc., Lear, Scott & Rasenberger, Washington, D.C., Taft, Stettinius & Hollister, Cincinnati, Ohio, on the brief.
 Frank J. Kelley, Atty. Gen. of Michigan, Joseph B. Bilitzke, Asst. Atty. Gen., Lansing, Mich., on brief as amicus curiae Civil Aeronautics Bd.
 Before WEICK, Chief Judge, CELEBREZZE, Circuit Judge, CECIL, Senior Circuit Judge.
 CELEBREZZE, Circuit Judge.
 
 
 1
 The Civil Aeronautics Board, on August 25, 1960, authorized and certificated North Central Airlines, Inc. to provide the Michigan Cities of Cadillac, Reed City, and Pontiac with one daily round trip air service. Cadillac and Reed City were served at Miller Field, Reed City, Michigan. Pontiac was served at Pontiac Municipal Airport.
 
 
 2
 In awarding air service to these communities, the Civil Aeronautics Board, hereinafter referred to as Respondent, required each community to board or enplane a minimum of five outbound passengers a day. In July, 1962, North Central Airlines petitioned the Respondent, alleging that the public convenience and necessity required an amendment of North Central's certificate deleting the air service to Cadillac-Reed City and Pontiac. Under the 'use it or lose it' policy, the Respondent ordered a deletion of this service upon finding that the Cities of Cadillac-Reed City and Pontiac, hereinafter referred to as Petitioners, did not enplane an average of five outbound passengers a day. Cadillac, Reed City and Pontiac appeal from this order.
 
 
 3
 The Cities of Cadillac and Reed City are located between Traverse City and Grand Rapids, Michigan. Cadillac, county seat of Wexford County, had a 1960 population of 10,112. The county population was 18,466. Reed City, county seat of Osceola County, had a 1960 population of 2,184. The county population was 13,595. Service to Cadillac-Reed City was provided with DC-3 aircraft through Miller Field, located one mile north of Reed City. The nearest other airports are at Grand Rapids, 72 road miles south of Reed City and 101 road miles south of Cadillac; Manistee, 49 road miles west of Cadillac and 67 road miles northwest of Reed City, and Traverse City, 53 road miles north of Cadillac and 77 road miles north of Reed City, Bus service to Grand Rapids is available on several schedules daily, and the fare is $2.90 from Reed City, and $3.05 from Cadillac.
 
 
 4
 Passengers enplaning at Miller Field totaled 923 in 1961, 829 in 1962, and 799 in 1963. Enplanements never exceeded an average of 2.6 passengers per day. The one daily round trip service provided by North Central included an early morning departure from Cadillac-Reed City destined to Grand Rapids and Chicago, and a late evening arrival at Cadillac-Reed City from Chicago and Grand Rapids. This schedule arrangement provided reasonably good timing for a business trip to Chicago or Detroit, the major sources of traffic for Cadillac-Reed City. A substantial reduction in subsidy need and expenses was found to result from the deletion of service at Cadillac-Reed City.
 
 
 5
 Pontiac is in Oakland County. The population of the City is approximately 83,000 and the population of the County is approximately 800,000. The area is heavily industrialized. Pontiac is about 25 road miles northwest of Detroit. Pontiac is approximately 45 road miles from Detroit's Willow Run Airport; 33 road miles from Detroit Metropolitan Airport; and 37 road miles from the Flint Airport. Divided highways connect Pontiac with Detroit Metropolitan Airport and with Willow Run Airport. Limousine service is available on an hourly basis between Pontiac and the Detroit airports.
 
 
 6
 The route awarded North Central started at the terminal point Sault Ste. Marie, Michigan, and came south, stopping at Pellston, Alpena, Saginaw-Bay City-Midland, Port Huron, Flint, and Pontiac, with a terminal point at Detroit. With the exception of several months, North Central scheduled northbound flights in the morning and southbound flights in the evening. Thus, the Pontiac business traveler could not travel south during the business day and arrive in any of the interested commercial areas on the same business day. Enplaned passengers totaled 824 in 1961, 420 in 1962, and 403 in 1963. In the year ended September 30, 1962, an average of 1.26 passengers enplaned in Pontiac, and for the year ended June 30, 1963, 1.14 passengers enplaned.
 
 
 7
 As a result of the many requests made by Pontiac, North Central added a second round trip service. This began in June of 1961 and was discontinued in August of 1961. A total of 173 passengers enplaned during the month of August. This was the only month during which Pontiac enplaned more than the minimum monthly requirement. However, this convenient second flight which departed southbound in the morning and arrived in the evening, resulted in an average use of only 1.6 Pontiac travelers.
 
 
 8
 Respondent found that neither Pontiac nor Cadillac and Reed City could generate five passengers a day with a regular two daily round trip service. A substantial reduction in subsidy need and expenses was found to result from the deletion of service to Pontiac. Upon these facts Respondent ordered deletion of air service to Cadillac, Reed City and Pontiac.
 
 
 9
 Petitioners maintain that by failing to first establish and define a standard of performance for the certificated carrier before applying the 'use it or lose it' test to the Petitioner, the Respondent unlawfully delegated its statutory authority to the air carrier. Petitioners argue they would meet the five-a-day standard if the air carrier was required to operate its route in a direction of travel oriented to the needs of the community, and the carrier afforded properly timed round trip schedules.
 
 
 10
 Before an air carrier engages in any air transportation, the carrier must be issued a certificate by the Civil Aeronautics Board. Such terms, conditions, and limitations of this certificate as being in the public interest, are found in 49 U.S.C. Section 1371.[1] What shall be considered as being in the public interest is set forth in 49 U.S.C. Section 1302.[2]
 
 
 11
 Respondent concluded that the public convenience and necessity no longer required continuation of North Central's service at Cadillac-Reed City and Pontiac. The Board recognized that the poor timing of schedules had been a factor in the development of the low traffic record of the Petitioners. The Board also considered that Cadillac-Reed City enplanements never exceeded an average of 2.6 passengers per day, and Pontiac enplaned an average of 1.26 passengers in 1962 and 1.14 passengers in 1963. The Board also found both Cities were within reasonable distance of larger airports which provided a wide selection of air schedules. In fact, Respondent found that Pontiac occupies a satellite position in relation to Detroit, and its large air transportation facilities. Both Petitioners have excellent access highways to these air transportation facilities.
 
 
 12
 Congress entrusted the Civil Aeronautics Board with the duty of promoting the development of a sound air transportation system and provided it with certain guidelines, enumerated in 49 U.S.C., Section 1302, hereinabove referred to.
 
 
 13
 To improve administrative adjudication, the Respondent is empowered to provide guidelines and one of the guidelines adopted by the Respondent is the 'use it or lose it' policy[3] which has been upheld as a proper standard to be used in determining public interest. Nebraska Department of Aeronautics v. Civil Aeronautics Board, 298 F.2d 286 (CA. 8, 1962).
 
 
 14
 Petitioners claim that the 'use it or lose it' standard required two round trips per day, citing the Respondent's finding in Mohawk Temporary Intermediate Points Renewal case, 32 C.A.B. 489. However, the Respondent, on a motion for reconsideration, clarified its ruling by stating as follows:
 
 
 15
 '2. Both the carrier and the Bureau of Air Operations claim, inter alia, that this is the first proceeding in which the Board has equated the 'use it or lose it' policy with two daily round trip service. This claim is based upon the following statement appearing on page 4 of the Board's opinion: 'Although both Mohawk and Bureau Counsel place a great deal of emphasis on the failure of Keene, during the entire six years it has been served by Mohawk, to even approach the five-a-day standard established by the Board, little recognition apparently is given by either party to the fact that for most of that time Keene received only one daily round trip rather than the two daily round trips contemplated by the 'use it or lose it' policy. * * *' 'In making this statement, the Board did not intend to effect any modification of its 'use it or lose it' policy, or to imply that a carrier must provide a two daily round trip service irrespective of the circumstances involved. The Board's test for recertification of a temporary point was clearly enunciated in the Trans-Texas and Frontier renewal proceedings. Under this test the critical fact is the use made by a temporary point of the service provided. Generally speaking, only a point which has enplaned an average of not less than five passengers daily during the most recent 12 months will be eligible for re-certification; and a point which has averaged less than five enplaned passengers daily during the most recent 12 months will lose its air service. However, there may be unusual or compelling circumstances which overcome the failure of a point to meet the minimum five-a-day standard. One of the many factors relevant to a showing of unusual or compelling circumstances is the quantity and quality of service which the local service carrier made available during the test period. In this connection, there is no hard-and-fast requirement that every local service point receive a two daily round trip service. But, where a point has been provided with only one round trip a day and an evidentiary showing is made that this quantum of service is insufficient to meet the travel needs of the community, this factor will be considered in assessing the existence of unusual or compelling circumstances.'
 
 
 16
 In the original certification of North Central, the Respondent authorized the carrier to overfly the Petitioners 'after one daily round trip because of their limited and unproven traffic potential as reflected in the record'. The Petitioners argue that people have neglected their facilities for the facilities at Grand Rapids and Detroit because of the inadequate service at Reed City and Pontiac. This also shows, however, that the service at Grand Rapids and Detroit is not only reasonably available to Cadillac-Reed City and Pontiac passengers, but also desirable because of the large selection of flights.
 
 
 17
 The findings of fact by the Respondent, if supported by substantial evidence, shall be conclusive. 49 U.S.C.A. Section 1486(e); Nebraska Departemnt of Aeronautics v. Civil Aeronautics Board, supra; Outagamie County, Wisconsin v. Civil Aeronautics Board, 355 F.2d 900 (C.A. 7, 1966).
 
 
 18
 The record discloses that the Respondent weighed and considered all the relevant factors. Respondent considered the schedule which certainly was not the most desirable service which could have been offered to the Petitioners. But schedules are related to and must take into account the needs and demands of all the cities served by the air line. Schedules also take into account the demand for transportation, and the cost of furnishing additional accommodations. These are complex factors. Weighing these factors, the Respondent found that the service did not justify the expense, and that the public interest was best served by deleting service to the Petitioners. As Mr. Justice Frankfurter said in Phelps Dodge Corp. v. National Labor Relations Board, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941):
 
 
 19
 'But in the nature of things Congress could not catalogue all the devices and stratagems for circumventing the policies of the Act. Nor could it define the whole gamut of remedies to effectuate these policies in an infinite variety of specific situations. Congress met these difficulties by leaving the adaptation of means to end to the empiric process of administration. The exercise of the process was committed to the Board, subject to limited judicial review. Because the relation of remedy to policy is peculiarly a matter for administrative competence, courts must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious domain of policy. On the other hand, the power with which Congress invested the Board implies responsibility-- the responsibility of exercising its judgment in employing the statutory powers.'
 
 
 20
 While the Phelps Dodge case dealt with the National Labor Relations Board, we believe the same principle is involved in matters which the Congress entrusted to the Civil Aeronautics Board, and we will not enter the allowable area of the Board's discretion. To do so would be sliding from the narrow confines of law into the more spacious domain of policy which is peculiarly a matter for administrative competence. We find there was substantial evidence to support the finding of the Respondent that service to the Petitioners should be deleted. We have examined the record for all other issues raised by Petitioners and find no substantial error.
 
 
 21
 The Orders of the Board are affirmed.
 
 
 
 [1]
 '(e) (1) Each certificate issued under this section shall specify the terminal points and intermediate points, if any, between which the air carrier is authorized to engage in air transportation and the service to be rendered; and there shall be attached to the exercise of the privileges granted by the certificate, or amendment thereto, such reasonable terms, conditions, and limitations as the public interest may require. * * *
 '(4) No term, condition, or limitation of a certificate shall restrict the right of an air carrier to add to or change schedules, equipment, accommodations, and facilities for performing the authorized transportation and service as the development of the business and the demands of the public shall require; except that the Board may impose such terms, conditions, or limitations in a certificate for supplemental air transportation when required by subsection (d)(3) of this section.'
 
 
 [2]
 'In the exercise and performance of its powers and duties under this chapter, the Board shall consider the following, among other things, as being in the public interest, and in accordance with the public convenience and necessity:
 (a) The encouragement and development of an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;
 (b) The regulation of air transportation in such manner as to recognize and preserve the inherent advantages of, assure th highest degree of safety in, and foster sound economic conditions in, such transportation, and to improve the relations between, and coordinate transportation by, air carriers:
 (c) The promotion of adequate, economical, and efficient service by air carriers at reasonable charges, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices;
 (d) Competition to the extent necessary to assure the sound development of an air-transportation system properly adapted to the needs of the foreign and domestic commerce of the United States, of the Postal Service, and of the national defense;
 (e) The promotion of safety in air commerce; and
 (f) The promotion, encouragement, and development of civil aeronautics.'
 
 
 [3]
 14 C.F.R. 399.11