439 F.2d 634
 FRONTIER AIRLINES, INC., Petitioner,
v.
CIVIL AERONAUTICS BOARD, Respondent,
Texas International Airlines, Inc., City of Houston, et al., Utah Agencies, Continental Air Lines, Inc., Intervenors.
 No. 23822.
 United States Court of Appeals, District of Columbia Circuit.
 Argued September 14, 1970.
 Decided January 27, 1971.
 
 Mr. Robert J. Corber, Washington, D. C., with whom Mr. Richard A. Fitzgerald, Denver, Colo., was on the brief, for petitioner.
 Mr. J. Michael Roach, Washington, D. C., for respondent. Messrs. Joseph B. Goldman, General Counsel, Civil Aeronautics Board at the time the brief was filed, O. D. Ozment, Deputy Gen. Counsel, Warren L. Sharfman, Associate General Counsel, Litigation and Research, Robert L. Toomey and James E. Keough, Attys., Civil Aeronautics Board, and Howard E. Shapiro, Atty., Department of Justice, were on the brief for respondent. Mr. R. Tenney Johnson, General Counsel, Civil Aeronautics Board, also entered an appearance for respondent.
 
 
 1
 Mr. Frederick S. Hird, Jr., Washington, D.C., with whom Mr. Emory T. Nunneley, Washington, D.C., was on the brief, for intervenor Texas International Airlines, Inc.
 
 
 2
 Mr. Vernon B. Romney, Salt Lake City, Utah, was on the brief for intervenor Utah Agencies.
 
 
 3
 Mr. Herman F. Scheurer, Jr., Washington, D.C., was on the brief for intervenor Continental Air Lines, Inc.
 
 
 4
 Messrs. Cecil A. Beasley, Jr., and John Law Elliott, Washington, D.C., entered appearances for intervenors City of Houston, et al.
 
 
 5
 Before McGOWAN and ROBINSON, Circuit Judges, and CHRISTENSEN,* U. S. District Judge, District of Utah.
 
 McGOWAN, Circuit Judge:
 
 6
 Under review is an airline route award order issued by the Civil Aeronautics Board in a proceeding known as the Reopened Pacific Northwest-Southwest Service Investigation. Petitioner Frontier Airlines complains of the Board's order extending to Salt Lake City an earlier award of a new Denver-Southwest route to intervenor Texas International Airlines (TXI), and denying an alternative proposal of Frontier that its Salt Lake City-Denver-Dallas/Fort Worth route be extended to Houston. We have examined the various contentions made by Frontier, but do not find in them, singly or collectively, adequate warrant for disturbing the Board's resolution of this matter.
 
 
 7
 * When the Board first turned its attention to single-carrier routes between the Pacific Northwest and the Southwest, it excluded turnaround service between Denver and Salt Lake, on the one hand, and points in the Pacific Northwest or the Southwest, on the other.[1] The Reopened Pacific Northwest-Southwest Service Investigation was for the stated purpose of considering these initially excluded possibilities of service between these two cities and the Southwest terminals of New Orleans, Houston, Dallas, Fort Worth, and San Antonio. After hearing, the Examiner recommended an award to Frontier of a Salt Lake-Denver-Dallas/Fort Worth route via Oklahoma City, Tulsa, and Wichita. For TXI, the Examiner proposed a route consisting of Salt Lake-Denver-San Antonio-Houston-New Orleans and a number of smaller points. On review by the Board, it approved in all substantial respects the recommendation in respect of Frontier. In the case of TXI, the Board eliminated Salt Lake.[2]
 
 
 8
 Frontier petitioned for reconsideration, seeking extension of its route to Houston. A number of civic representatives in Utah asked that more service be provided between Salt Lake and the Southwest.[3] The Board decided, in the order under review, that it had been unwise in eliminating Salt Lake City from its award to TXI. It restored that point and, with the TXI route so enlarged, the Board concluded, after what it described as comparative consideration, that TXI was superior to all other applicants for the purpose of connecting Salt Lake with points in the Southwest. Accordingly, it denied the petitions for reconsideration filed by Frontier and other parties.
 
 
 9
 Frontier's challenge to this action of the Board is principally grounded upon the claim that the Board's conclusions are either in conflict with, or inadequately supported by, the facts of record.[4] It asserts, first, that the Board's change of mind about permitting TXI to serve Salt Lake leaves the Board with contradictory findings of fact which cannot be regarded as providing a proper foundation for its ultimate conclusions. Second, Frontier contends that that conclusion is invalidated by patent mistakes of fact on the Board's part. We take up these points in turn.
 
 II
 
 10
 The Board, like everyone else, always appears at some disadvantage when it changes its mind. It may indeed be more vulnerable in this regard than the ordinary decision-maker because expertise is both its reason for being and the shield which it holds out to protect itself from undue meddling by the layman. There is room, however, for even the expert agency to revise its judgment, as witness the statutory procedure for reconsideration. The altered conclusion will, nevertheless, bear an inevitably enlarged burden of justification, and properly so. This is especially true in a case where, as here, the primary initiative for change comes from local interests, as distinct from the carrier who would be its immediate beneficiary. It is with this heightened alertness that we address ourselves to the deficiencies claimed to reside in the Board's switch.
 
 
 11
 Although the Board's central purpose in this general route investigation was to connect the major cities of the Pacific Northwest with those of the Southwest by long-haul service, it also recognized from the beginning that, within this larger framework, there was a definite need for regional turnaround authority. The fact that a resident of Houston could get easily by air to Seattle would hardly satisfy the need of a businessman in Lubbock, Texas, who wished to make a quick trip to Salt Lake City. The consideration of these regional needs was, however, deferred until the long-haul authorities were determined, since the Board did not want to weaken such grants by simultaneous regional awards. It thought that some of the local service might perhaps prove to be best supplied by the long-haul carriers, whereas other aspects of that need could most efficiently be taken care of by the three local service carriers in the area.
 
 
 12
 When in due course it took up the regional needs, it found that TXI could play a very useful role, particularly because of the existing authority it possessed to serve a relatively large number of points in Louisiana and Texas. The merits of extending that carrier to Denver were obvious and had met with no significant objection. The Examiner, indeed, was of the view that Salt Lake should also be included within the range of these benefits, and so recommended. The Board was more cautious on this score. Its professed concern was with whether the new and improved service would produce enough passengers between Salt Lake and the Southwest points served by TXI to admit of profitability.
 
 
 13
 To support the operation financially, the Board thought that TXI would have to put at least some of its flights through Denver so as to pick up a part of the Denver-Salt Lake local traffic. This would create what it characterized as undesirable competition with Frontier, also a subsidized local carrier. In any event, said the Board, the traffic between Denver and Salt Lake was not large enough "to permit an unlimited proliferation of carriers without adverse effect."
 
 
 14
 The petition for reconsideration filed by the Utah Agencies asserted, among other things, that the Board's estimates of traffic between Salt Lake and the Southwest points were too low, even using the Board's own methods of prediction, and also failed to include a proper allowance for normal growth, particularly if better service was provided. It was also argued that the Board was discriminating against Salt Lake because in other cases the Board had given routes where traffic was light by coupling them with access to other segments which could provide the needed increment. The Board, so it was said, had done this in this same investigation by including Seattle in the routes awarded between Portland and the Southwest. Further, it was alleged that the result of the route investigation was to give Salt Lake single-plane service only to Dallas in the Southwest, leaving it worse off in this respect than it had been before.
 
 
 15
 Certainly this last point must have impressed the Board because, in its opinion on reconsideration, it announced its reversal of position by first characterizing its enlarged award as providing unrestricted authority between Salt Lake, at one end, and Houston, San Antonio, and New Orleans, at the other, as well as nonstop authority between Salt Lake and eleven other points in Louisiana and Texas.[5] The Board found that a reappraisal of the evidence indicated that, if TXI were permitted to serve Salt Lake by way of Denver, its extension to Salt Lake would be profitable for itself and not have a significantly adverse impact on Frontier or any other carrier.[6]
 
 
 16
 Frontier's first line of attack is to say that the Board cannot say at one stage of the proceeding that the Denver-Salt Lake market is fully served, and, at another, that it is in the public interest to put a fourth carrier into that market. We do not understand the Board as saying, however, that there is a need for a fourth carrier generally.[7] Ideally, it would appear to have preferred to adhere to its original purpose not to open up the Denver-Salt Lake traffic to further competition. What it has decided is that any danger to the public interest this may entail is more than counter-balanced by the need to establish good air connections between Salt Lake City and as many points as possible in the Southwest. This latter objective can best be achieved through the instrumentality of TXI, although initial feasibility from a financial standpoint necessitates giving TXI some participation in the Denver-Salt Lake traffic. The question for the Board was: Will the public benefits of the enlarged Salt Lake-Southwest service outweigh the burdens of providing more service between Denver and Salt Lake than may presently be needed?
 
 
 17
 This impresses us as just the kind of frequently difficult question which Congress created the Board to ask — and to answer. And this is not the first time it has done so, with the approval of this court. In Delta Air Lines, Inc. v. CAB, 107 U.S.App.D.C. 174, 187, 275 F.2d 632, 645 (1959), cert. denied, Trans World Airlines, Inc. v. Delta Air Lines, Inc., 362 U.S. 969, 80 S.Ct. 953, 4 L.Ed.2d 900 (1960), we said:
 
 
 18
 "It is true that the Board did not find any need for the Atlanta-Florida service awarded to TWA, considered as local service. But it specifically found a need for trunkline service from St. Louis-Nashville to both Atlanta and Florida. We find no error in the Board's award of the route without an absolute restriction against local service between Atlanta and Florida * * *."[8]
 
 
 19
 We find no fatal inconsistency between the Board's saying, as it did the first time round, that it found no need for any enlargement of the Denver-Salt Lake service, and its subsequent finding that, although it continued to find no such need per se, the public convenience and necessity would on balance be better served by adding to that service in order to make it possible to provide for the very real needs of the Salt Lake-Southwest market. The question remains not one of whether that judgment was foreclosed to the Board by virtue of its earlier decision, but whether the altering of that decision was permissible by reference to the facts relied upon to justify it.
 
 
 20
 Frontier urges that, even assuming the theoretical possibility that the Board could change its mind without thereby involving itself in error, it has not succeeded in doing so here. In the process, so it is said, the Board has made patent mistakes of fact which invalidate its findings with respect to the degree of adverse impact upon Frontier. Frontier points, first, to the assumption in the Board's opinion that TXI would operate two round trips a day between Salt Lake and the Southwest, one of which would be via Denver. This, says Frontier, is at odds with TXI's own exhibit of proposed schedules, which reflect 3½ daily round trips by way of Denver.
 
 
 21
 The Board's response to this allegation of a mistaken reading of the record is that, in exercising its judgment, it was not bound by TXI's estimate of the Denver service it would supply, but was entitled to make its own predictions as to the amount of service TXI would in fact be likely to provide once it actually began to use its new authority and had acquired some experience with the traffic it would get. Events have in this instance confirmed the greater accuracy of the Board's assumptions. When this court refused, on February 24, 1970, to stay the effectiveness of the order under review, TXI began operations under it; and the schedules between Denver and Salt Lake numbered 1½ round trips per day — drastically below those estimated by TXI at the time of the hearing. There has, thus, been no mistake by the Board of facts shown by the record, but only an exercise of predictive judgment with respect to a subject matter which had no certain and fixed content. This is precisely the kind of function which the Board is required to perform in the discharge of its responsibilities; and we do not hold it to a standard of absolute accuracy. See United Airlines v. CAB, 81 U.S.App.D.C. 89, 155 F.2d 169 (1946); American Airlines, Inc. v. CAB, 89 U.S.App.D.C. 365, 192 F.2d 417 (1951).
 
 
 22
 Frontier asserts, secondly, that the Board was mistaken in assuming that, without access to the Denver-Salt Lake local traffic, a reduction in TXI's need for subsidies could not be reliably realized. It argues that the record supports the proposition that, without such access, a reduction of $23,000 would have resulted. This appears to be a claim made for the first time upon appeal to this court and is not, therefore, strictly cognizable by us. 49 U.S.C. § 1486(e); Seaboard and Western Airlines v. CAB, 87 U.S.App.D.C. 78, 183 F.2d 975 (1950). It is apparent, in any event, that $23,000 is a painfully narrow margin, and one the Board was not required to depend upon in the context of the necessarily contingent character of its other estimates of the amount of traffic available from the Southwest points.
 
 
 23
 Lastly, Frontier represents that the Board erred in its measurement of adverse impact upon Frontier by (1) failing to take account of the interline connecting traffic it would lose at Dallas, and (2) giving weight to the "growth-offset" principle. The former rests upon the claim that Frontier's new authority, Salt Lake-Denver-Dallas/Fort Worth, would bring to it connecting traffic for Salt Lake from Houston, San Antonio, and New Orleans; and that the award of Salt Lake authority to TXI would inevitably reduce the amount of this connecting traffic which Frontier might otherwise carry. Although Frontier's new authority went into effect seven months before that of TXI, both grants were made in the same proceeding. Frontier's award was made without reference to any connecting traffic it would bring to Frontier at Dallas from Houston, San Antonio, and New Orleans. The investigation was ongoing with respect to which carrier could best serve those points and Salt Lake, culminating in the choice of TXI. It is not for Frontier now to say that the Board, in the last phase of this regional service investigation, should have been concerned with this kind of possible diversion. The objective of this kind of a route case is to work out the best pattern of service, and to choose the carriers which together are most likely to achieve this goal. The fact that one award comes before another does not change the essential nature of the proceeding.[9]
 
 
 24
 The Board estimated that, flying one round trip a day between Denver and Salt Lake, TXI would preempt no more than 2% of the local traffic — an amount which the Board characterized as in reality no diversion at all since it would be more than offset by normal growth. Even if additional round trips were operated, it thought that the TXI penetration would be relatively limited because of its long-haul restriction as compared with the unrestricted authority of the three other carriers, then scheduling 18 round trips per day. In any event, concluded the Board, the diversion involved would be overweighed by the public interest considerations inherent in the enlarged Salt Lake-Southwest service which could be mounted by TXI.
 
 
 25
 It will thus be seen that the Board did not mistakenly assume that there would be no adverse impact upon Frontier. Its judgment was that it would be insignificant, particularly since it found the Denver-Salt Lake market to be a growing one with a steadily increasing number of passengers to be competed for by the four scheduled carriers. Even if that impact proved somewhat more serious than it expected, however, it is clear that the Board believed the values it saw in the enlarged Salt Lake-Southwest service to be compelling. This was a judgment for the Board to make, and the fact that a "growth-offset" factor entered into it in a tangential and far from conclusive way does not invalidate it. There is indeed no visibly crippling vice in the "growth-offset" factor as such, and the Board was entitled to inform its judgment by reference to it, as it may by looking at any and all similarly relevant considerations.
 
 
 26
 The Board's change of position in this case on extending TXI's award to Salt Lake stands or falls, in the last analysis, on the strength of its judgment as to the importance of giving Salt Lake the maximum of direct connections with the Southwest. In arriving at the final judgment it has, the Board has denied Frontier no procedural or substantive right conferred upon it by the regulatory scheme created by Congress. Having satisfied ourselves on this score, our function is at an end.
 
 
 27
 The designing of an airline route pattern for the United States most compatible with the public interest is, unhappily, not an exact science. The airline industry and the public alike are largely at the mercy of the degree of skill and disinterest and good sense which the Board periodically brings to this delicate and difficult task. Courts have no special qualifications in this area for second-guessing the Board as to the merits of its determinations, once they have been arrived at within a framework of procedural fair play. Unwarranted judicial intervention only serves to divert the spotlight of accountability for the health of air transportation from the place where it should be steadily and continuously focused, that is to say, on the Board.
 
 
 28
 Affirmed.
 
 
 
 Notes:
 
 
 *
 Sitting by designation pursuant to 28 U.S. C. § 292(c)
 
 
 [1]
 The awards made by the Board in the so-calledPacific Northwest-Southwest Service Investigation were of noncompetitive routes to Braniff Airways and Continental Air Lines. Neither Salt Lake nor Denver was made part of either of these awards.
 
 
 [2]
 Its reason for doing so was that the traffic available between Salt Lake City and the Southwestern points on TXI's route was thought to be so light as to put in question the profitability of such operations, thereby causing TXI to route such flights through Denver in order to rely upon Salt Lake-Denver local traffic. This, said the Board, would create "undesirable competition with Frontier, another subsidized local carrier, in a market also served by two trunkline carriers."
 
 
 [3]
 In the answer filed by it to the various petitions for reconsideration, TXI noted that the Utah Agencies supported an extension of Continental Air Lines between Salt Lake and Houston and New Orleans. It pressed upon the Board the superiority of itself for this purposeif the Board were to decide that more Salt Lake service should be provided. It professed to understand and appreciate "the Board's desire not to extend [TXI] or any other carrier in direct competition with Frontier between Denver and Salt Lake City"; and it suggested that its route be extended to Salt Lake directly from Amarillo without going through Denver, thereby providing "the dual advantage of giving Frontier maximum protection in its Denver-Salt Lake City market and giving the Salt Lake City civic parties as well as the Southwest area civic parties a minimum of circuity in single plane service."
 
 
 [4]
 An objection of a different order is that the Board failed to give comparative consideration to Frontier's request for authority to extend its Salt Lake route to Houston. Ashbacker Radio Corp. v. FCC, 326 U.S. 327, 66 S.Ct. 148, 90 L.Ed. 108 (1945). We have examined this contention with care, and are satisfied that the Board has adequately fulfilled its obligations under this doctrine. Frontier's was only one of several proposals for enlarging the air connection between Salt Lake and the Southwest. The Board's order recites that it had considered them all on a comparative basis. Its preference for the TXI extension to Salt Lake was explicitly derived from the fact that TXI was found to serve "more points and markets in the Southwest than any other applicant * * * [and] should be selected." It could, said the Board, provide "an initial pattern of single-plane service equal or superior to that which could be provided by any other applicant, and, in addition, such authority will allow additional service to be provided between Salt Lake City and numerous points in the Southwest in accordance with future traffic requirements." Frontier's proposal, by contrast, would provide single-plane service to only one additional point, namely, Houston
 Frontier does not appear to contradict this finding of the Board, but complains rather that the Board did not address itself in terms to other factors urged on its behalf. But, once the Board has fixed upon a central consideration which it regards as conclusive, it need not deal in detail with every other aspect of the matter. Outagamie County v. Civil Aeronautics Board, 355 F.2d 900, 906 (7th Cir. 1966). We see no need to pursue further this branch of Frontier's argument.
 
 
 [5]
 These points were, in Louisiana, Lafayette, Lake Charles, and Shreveport; and, in Texas, Austin, Beaumont/Port Arthur, Longview/Kilgore/Gladewater, San Antonio, Abilene, Midland/Odessa, Lubbock, and Amarillo. The Board further observed that TXI would "provide first single-carrier service between Salt Lake City and a large number of other points on its system in Texas and Louisiana, and also will be in a position to mount single-plane service from such points in accordance with traffic demands."
 
 
 [6]
 The Board estimated an operating profit for TXI in 1970 of nearly one million dollars, and a subsidy need reduction of $165,000. It remarked TXI's willingness to accept the award without access to the Denver-Salt Lake local traffic, but rested upon its own judgment "that a subsidy need reduction cannot be reliably achieved unless an intermediate stop at Denver is permitted."
 
 
 [7]
 The Board's conclusion is stated as TXI "should be awarded authority in this market subject to a long-haul restriction even though there is no needper se for an additional carrier."
 
 
 [8]
 The court further noted that a long-haul restriction had been placed by the Board on the Atlanta-Florida segment. In the case before us, the Board has attached a similar long-haul restriction to TXI's entry into the Denver-Salt Lake local market. For other examples of the Board's use of one market, where service is presently in no need of supplementation, to support a new and needed service in other markets,see Florida-Texas Service Case, 24 C.A.B. 308, 320 (1956); Service to Phoenix Case, 26 C.A.B. 193, 198 (1957), aff'd, Frontier Airlines, Inc. v. CAB, 104 U.S.App.D.C. 78, 259 F.2d 808 (1958); and Domestic Coterminal Points-Europe All-Cargo Service Investigation, Order 69-4-140 (April 30, 1969).
 
 
 [9]
 The Board points out that this diversion claim by Frontier was first made on petition for reconsideration, seven months after Frontier had implemented its Salt Lake-Denver-Dallas/Fort Worth award. It made no effort to show actual diversion but, on the basis of schedules in the Official Airline Guide, estimated that it would carry 40% of the traffic by way of a Dallas connection but for the extension of TXI's award to Salt Lake. The Board has argued to us, with some apparent justification, that this estimate is wholly unrealistic. In any event, the Board's position is that in no view can it override the considerations of public convenience and necessity which persuaded it to meet the Salt Lake-Southwestern need through the superior medium of TXI