DELTA AIR LINES, INC., Petitioner,

v.

CIVIL AERONAUTICS BOARD,
Respondent,

Eastern Air Lines, Inc., Intervenor.

No. 76–1095.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 31, 1977.
Decided Sept. 21, 1977.

Thomas Michael, Alexandria, Va., also entered an appearance for intervenor.

Before TAMM and MacKINNON, Circuit Judges, and OLIVER GASCH,* U. S. District Judge for the District of Columbia.

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

Delta Air Lines, Inc. (Delta) seeks review of a Civil Aeronautics Board (Board) decision wherein the Board, having determined that the public convenience and necessity required the authorization of nonstop air service between Fort Myers, Florida, and Atlanta, Georgia, awarded Eastern Air Lines, Inc. (Eastern) the new route. The Board found that of the six applicants for the route Eastern had the better service proposal, route structure, beyond-segment capability, market identity, and a greater need for economic strengthening. We must determine whether the Board's discretionary selection of Eastern rests on adequate findings supported in the record and represents a fair comparative consideration of the carriers' applications. We find that the Board's order is supported by substantial evidence in the record and constitutes a fair comparative consideration of the applications. Therefore we affirm the Board's order.

Don M. Adams, Atlanta, Ga., with whom James W. Callison, Atlanta, Ga., Robert Reed Gray, Benjamin R. Achenbach, Jr. and John E. Gillick, Jr., Washington, D. C., were on the brief, for petitioner.

Barbara Thorson, Atty., C. A. B., Washington, D. C., with whom James C. Schultz, Gen. Counsel, Jerome Nelson, Deputy Gen. Counsel, Glen M. Bendixsen, Associate Gen. Counsel, C. A. B., Barry Grossman and Lee I. Weintraub, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondent.

Allison Wade, Washington, D. C., with whom Robert N. Duggan, Washington, D. C., was on the brief, for intervenor. Paul

## HISTORY OF THE LITIGATION

This proceeding was instituted on December 6, 1974, by Board Order 74–12–26, to investigate the need for nonstop air service between Fort Myers, Florida, and Atlanta, Georgia. Prior to the institution of this proceeding, National Air Lines, Inc. (National) was the sole certificated air carrier serving Fort Myers. National's domestic system extends primarily to other Florida cities, up the east coast of the United States, and along the southern tier of states to California. Consequently, Fort Myers was without adequate air service to Atlanta, the major air transportation center and

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

hub of the southeastern United States, and had no access at all to the vast Midwest/Great Lakes region. In light of this, a major focus of the administrative proceedings centered on Fort Myers' need for service to the Midwest/Great Lakes area via the Atlanta gateway. J.A. 92, 189.

Six certificated air carriers, Delta, Eastern, National, Northwest Air Lines, Inc., Southern Airways, Inc., and United Air Lines, Inc., applied for the Fort Myers-Atlanta route. The Administrative Law Judge (ALJ) concluded the two most logical candidates for the route award were Delta and Eastern, since both carriers had major operations at Atlanta and were authorized to serve the greatest number of Midwest/Great Lakes cities beyond Atlanta. As between Eastern and Delta, the ALJ determined that the public interest would be served by awarding Eastern the new route. The losing applicants, including Delta, petitioned the Board for review of the ALJ's carrier-selection decision. The Board found that the ALJ's decision was reasonable and affirmed it. Thereafter, Delta filed a petition for reconsideration, and the Board stayed Eastern's permanent authority but granted Eastern temporary exemption authority to commence service between Fort Myers and Atlanta on December 10, 1975. This action was followed by the Order on Reconsideration January 22, 1976, which reaffirmed the award to Eastern and denied all petitions for reconsideration. Delta then filed this petition for judicial review on January 29, 1976.

FACTUAL BACKGROUND

The need for improved air service at Fort Myers was not seriously disputed by any of the parties participating in the administrative proceedings, and that need is not questioned by Delta in this appeal. For our purposes it will suffice to point out that the record indicated that Fort Myers (1) was among the fastest growing cities in the nation (J.A. 90); (2) experienced a large increase in the volume of air passenger traffic in general and, in particular, between it and cities in the midwest (id. at

189–90, 192); (3) did not receive adequate service to Atlanta or the midwest through the Tampa gateway which was the only direct connecting point to Atlanta or the midwest for Fort Myers passengers. The evidence clearly demonstrated that the public convenience and necessity required the institution of the proposed service to and from, as well as through, Atlanta.

Since a prime consideration in the authorization of this new route was the need for service from Fort Myers to the midwest, the ALJ narrowed the field of six applicants to two, Eastern and Delta. Id. at 94. Both of these carriers' route systems radiated from the Atlanta airport, and the new route readily integrated into their systems. Furthermore, Eastern and Delta proposed to offer levels of service that could not be equaled by any of the other four applicants. The ALJ candidly admitted that the choice between Eastern and Delta was an extremely close one. Id. at 191. In arriving at a decision in favor of Eastern, the ALJ considered a number of carrier-selection factors, including service proposals, route structure and ability to provide service to points beyond Atlanta, carrier need for economic strengthening, and carrier identification in the area under consideration. Id. at 188.

The service proposals were appraised in terms of their frequency and timing. Eastern's proposal included four daily nonstop round-trips from Fort Myers to Atlanta. Delta's proposal scheduled four round-trips in the winter and three in the summer months. The ALJ concluded that, with four round-trip flights per day, year round, Eastern would provide more frequent service than Delta. Id. at 118. The ALJ also found that Eastern's scheduling provided significantly more convenient timing for passengers bound to and from Fort Myers. Delta's proposed wintertime departure times from Columbus and Chicago and arrival time at Detroit were 7:00 a. m., 3:15 a. m., and 2:45 a. m., respectively. Id. at 112. The Eastern flights were scheduled at more

convenient hours.[1] The ALJ did note that Eastern had one flight scheduled to depart Minneapolis/St. Paul at 7:00 a. m., the same as the Delta flight from Chicago. Although this is an inconvenience, the amount of traffic out of Minneapolis/St. Paul is only twenty-seven percent as much as that out of Chicago. *Id.* at 120. Thus, fewer people would be inconvenienced by the Eastern flight.

The ALJ found an added convenience in Eastern's proposal over and above the frequency and timing of its flights. All but one of Eastern's flights will provide first single-plane [2] nonstop service to and from Atlanta, giving one-stop service for Fort Myers. *Id.* at 168. The Delta schedule connects Fort Myers with only two-stop service to Detroit and Columbus. The ALJ concluded that nearly half the travelers on the first single-plane service would have two-stop flights on Delta, while practically all would have one-stop service on Eastern. This was another convenient feature in Eastern's favor.

Eastern's proposal was also deemed superior in that it offered more convenient service to the traveling public from the standpoint of connecting flights in and out of Atlanta to nearly all points which exchange significant numbers of passengers with Fort Myers. *Id* at 120. Eastern will provide Fort Myers the first single-plane service to six important points to the north and midwest: Chicago, St. Louis, Minneapolis, Pittsburgh, and, in 1977, Detroit and Charlotte. Delta would offer single-plane service to four cities in the summer: Chicago, Detroit, Cincinnati, and Columbus. Indianapolis and Dayton would be added in the winter. Eastern's first single-plane one-stop service would reach markets which generated 25,790 passengers in 1974, while Delta's similar proposal would reach markets which generated 23,870 passengers in 1974. *Id.* at 124–25.

Both Eastern and Delta had identity with Atlanta and markets between Atlanta and Florida. Eastern offers nonstop service between Atlanta and fifty cities. In the Florida markets, Eastern serves the Tampa area with 44 daily flights, Sarasota with 15, Orlando with 30, West Palm Beach with 23, Fort Lauderdale with 40, and Miami with 102. *Id.* at 126. Eastern has been serving Florida's west coast for thirty-seven years. Delta also has very strong identity in the Florida markets. The ALJ noted that carrier identity is but one part of the picture, and unless it appears that an applicant is so unknown, unliked, or unsuccessful in the area that its likelihood of economic success there is threatened, a slight difference in degree of identity should not control over other more important considerations. Thus, since both applicants enjoyed strong identity, this factor was not as important in making the final decision.

Historically, route and system strengthening have always been given considerable weight by the Board in the carrier-selection area. The ALJ found that Eastern was most in need of the economic strengthening the Fort Myers-Atlanta route would provide. *Id.* at 127. From 1970–1974, Eastern suffered a system-wide loss of $12,000,000. During the same period, Delta earned a profit of $323,550,000. Were Delta to receive the new route, the ALJ estimated the resulting loss of revenues to Eastern could amount to as much as $2,800,000.

Delta's petition for review challenged only the selection of Eastern. Before the Board, Delta's main contention was that Eastern would be unable to implement its service proposal since Eastern had relied upon traffic projections that were too high. *Id.* at 165–66. The Board found Delta's challenge to be similar to those made in numerous Board cases which stem from the fundamental problem that all Board route decisions must be made on the basis of forecasting assumptions, some of which

---

1. Eastern's flights generally were scheduled between 10:00 a. m. and 10:00 p. m. J.A. 110.

2. Single-plane service entails round-trip transportation from point A to point B and points beyond on a single plane by the same carrier.

may later prove inaccurate.[3] *Id.* at 191. In reaching a route decision, the Board noted that it relies on a number of factors, including, particularly in this case, the applicant's route structure and its economic incentives to provide the service proposed. *Id.* In this case, the Board found that the applicant having access to the largest volume of support traffic would be in the best position to provide the greatest frequency and capacity and fly the maximum number of passengers over the Atlanta-Fort Myers segment. As a corollary, the Board felt that such an applicant would also convenience the largest number of beyond-segment passengers. In this regard, the Board agreed with the ALJ that the choice was essentially between Eastern and Delta and that choice between these two carriers was extremely close. *Id.* The Board noted that both Delta and Eastern claimed they would convenience more beyond-segment passengers and provide superior beyond-segment service. *Id.* The Board concluded that Eastern proposed first one-stop single-plane service in markets which generated 2,000 more passengers than Delta's proposed markets and that Eastern would provide first single-carrier[4] opportunities in markets which generated about 6,000 more passengers than Delta's proposed markets. Thus, Eastern's route structure was adjudged to be a factor in Eastern's favor. *Id.* at 193.

The Board also found that while both Delta and Eastern would experience a loss of traffic and revenue if the other were to receive this new route opportunity, the selection of a carrier which is somewhat less able on a comparative basis to absorb the loss is not inappropriate in a close case. Consequently, the Board concluded that, taken together with the other decisional factors, on balance, the ALJ's selection of Eastern was reasonable. *Id.* Eastern stood

by its service proposal, and the Board found no reason to doubt that the carrier would implement that proposal. *Id.* at 194.

Before this court, Delta sets forth four claims of error in the Board's order. First, Delta argues that the Board erred by accepting Eastern's traffic forecast figures and declaring an advantage for Eastern when, according to Delta, Eastern's forecast was actually the same as Delta's. Delta asserts the Board also erred when it found that Eastern would operate at a load factor of 39%, when the correct figure was 34.4%. Second, Delta contends that the Board failed to articulate adequately the so-called "economic incentives" decisional factor, neglected to clarify the decisional significance of this factor, and did not make comparative findings to support its conclusion that Eastern's economic incentives ensured the best service. Delta concludes this portion of its argument by asserting that these shortcomings contributed to a decision unsupported by a reasonable basis, leaving Delta and this court to speculate as to the grounds for the Board's decision. Third, Delta cites the Board's failure to address the significant factor of "comparative economic efficiency" as a violation of its statutory mandate to promote adequate, economical, and efficient air services. Finally, Delta argues that the unexplained inconsistency between the Board's decision in this case and a contemporaneously decided case constitutes reversible error.

## ISSUE ANALYSIS

■ At the outset of our analysis, we pause to note the parameters of the scope of our review. The present controversy is in an area into which courts are seldom justified in intruding. As we pointed out in *Pinellas Broadcasting Co. v. FCC*, 97 U.S. App.D.C. 236, 238, 230 F.2d 204, 206, *cert.*

---

3. The Board noted as an example the Dallas/Fort Worth-Phoenix Nonstop Service Case, Order 69–7–137 (July 24, 1969), where Delta proposed to operate five daily round trips over the primary segment and extend those flights to eleven first single-plane cities east of Dallas. Delta, however, instituted only a four round trip per day pattern at the outset and now

provides only three. J.A. 192. In other instances, the carrier awarded a route has implemented more service than the Board had thought feasible.

4. Single-carrier service entails round trip transportation from point A to point B and points beyond without a change of carriers at point B.

*denied*, 350 U.S. 1007, 76 S.Ct. 650, 100 L.Ed. 869 (1956), the selection of an awardee from among several qualified applicants is basically a matter of judgment, often difficult and delicate, entrusted by Congress to the administrative agency. In the context of an air route proceeding, we have commented that

> [t]he designing of an airline route pattern for the United States most compatible with the public interest is, unhappily, not an exact science. . . . Courts have no special qualifications in this area for second-guessing the Board as to the merits of its determinations, once they have been arrived at within a framework of procedural fair play. Unwarranted judicial intervention only serves to divert the spotlight of accountability for the health of air transportation from the place where it should be steadily and continuously focused, that is to say, on the Board.

*Frontier Air Lines, Inc. v. CAB*, 142 U.S. App.D.C. 124, 131, 439 F.2d 634, 641 (1971). It is then with these limitations clearly in mind that we now turn to an analysis of the specific issues before us.

In making a carrier-selection decision, the Board must be keenly aware of the public interest and what the public convenience and necessity require. 49 U.S.C. §§ 1302(a), (c) (1970). The Board's basic responsibility is to develop an air-transportation system properly adapted to the present and future needs of the foreign and domestic commerce of the United States, of the postal service, and of the national defense. *Id.* § 1302(a). The Board is to accomplish this goal by promoting adequate, economical, and efficient service by air carriers at reasonable rates, without unjust discrimination, undue preferences or advantages, or unfair or destructive competitive practices. *Id.* § 1302(c). In selecting a particular carrier from among several applicants, the Board must balance the competing applications against one another in light of various determinant factors. The Board's determination in this case was based upon the conclusion that Eastern had the superior service proposal and the better route struc-

ture and access to traffic in key markets. Furthermore, the Board found that Eastern had the greater need for the economic strengthening that would result from the authorization of what all parties agreed would be a profitable operation. The Board's findings are both adequate and supported by the record. The grounds for the selection of Eastern were set out clearly and are not capricious. Therefore, we are bound to affirm the Board's order.

■■■■ The offering of a superior service proposal is a valid carrier-selection criterion. *See Delta Air Lines, Inc. v. CAB*, 162 U.S.App.D.C. 21, 23–24, 497 F.2d 608, 610–11 (1973). The record evidence supports the finding that Eastern's flights would be more frequent than Delta's and at more convenient times. The record evidence also indicated that Eastern's single-plane and single-carrier service was superior to Delta's. All but one of Eastern's flights would provide first single-plane nonstop service to and from Atlanta, thus giving one-stop service for Fort Myers. On the other hand, nearly half the travelers on Delta would have only two-stop service to Fort Myers. Eastern's proposal was appropriately given the edge.

■■■■ A second carrier-selection criterion appropriately implemented by the Board was carrier need for economic strengthening. Traditionally, the Board has recognized an airline's general economic position as a relevant carrier-selection factor, in view of the Board's responsibility to develop a national air transportation system. *See United Air Lines, Inc. v. CAB*, 81 U.S. App.D.C. 89, 92, 95, 155 F.2d 169, 172, 175 (1946); *Service to Liberal Case*, 23 C.A.B. 898, 904 (1956). *See also Southwest-Northeast Service Case*, 22 C.A.B. 52, 59 (1955). The Board has determined that preserving the financial integrity and security of existing air carriers is desirable as a matter of public policy in order for the country to obtain safe and regular airline service. Here the Board considered the two carriers' relative financial strength in terms of recent profit history. Of the two carriers,

the conclusion was inescapable that Eastern was the one in need of economic strengthening.[5]

Delta argues that in finding Eastern's service proposal superior the Board made factual mistakes with regard to the parties' predictions concerning traffic forecasts, load factors, and profitability. Delta claims that since the choice was an extremely close one, *Braniff Airways Inc. v. CAB*, 126 U.S.App.D.C. 399, 379 F.2d 453 (1967), requires reversal of the Board's decision. The case at bar does not present a *Braniff* situation. There the Board's finding rested upon "critical" facts which were refuted in the record. The error claimed by Delta here was not material but rather was one of a subsidiary nature. As we held in *Braniff*, where a subsidiary finding is unsupported or otherwise erroneous but the court is clear that its presence was not material to the ultimate finding, reversal is inappropriate. *Id.* 126 U.S.App.D.C. at 412, 379 F.2d at 466. The court should affirm if it appears all the important basic findings made by the Board are supported by substantial evidence. *Id.* A court should not upset a decision because of errors that are not material, there being room for the harmless error doctrine. *Greater Boston Television Corp. v. FCC,* 143 U.S.App.D.C. 383, 393, 444 F.2d 841, 851 (1970).

Here, the Board was well aware of the discrepancies in the parties' economic predictions. J.A. 191. However, it was unquestionably shown by the record that the authorization of nonstop service to Fort Myers would attract substantial traffic and operating profit for Eastern. This finding was based on the Bureau of Operating Rights (BOR) estimate that Eastern's service proposal would attract 110,000 Fort Myers passengers. Delta contends that Eastern, having estimated 196,000 passengers, acknowledged that should BOR be correct, it would drop one of the four daily nonstop flights during the off-peak season. Delta concludes from this that there was no difference in the two carriers' service proposals, and the Board erred in finding there was. In fact, Eastern acknowledged only that if BOR were correct, it might have to discontinue one flight in off-peak months. However, Eastern adhered to its own estimate and its intent to implement its proposal. Furthermore, the finding of superior frequency was not *the* critical finding favoring Eastern.[6]

A related error which, according to Delta, requires reversal of the Board's decision was the Board's reference to a projected load factor of 39% by Eastern over the Fort Myers-Atlanta segment. It appears from BOR's estimate that the correct figure was 34.4%. The load factor was mentioned by the Board only in the context of pointing out the immateriality of relatively low load factors over the Fort Myers-Atlanta entry segment into beyond markets. The prime consideration here was the profitability of the overall operations. The overstated load factor would only be material if the Board had used it to project profitability for the entry segment, which it did not. Thus, to any extent the Board erred, the error was harmless and reversal is not required. *Greater Boston Television Corp. v. FCC, supra.*

Delta also asserts that Eastern lacked the economic incentive to implement its service proposal. For support, Delta points to Eastern's high load factors in other Florida monopoly markets. The Board noted that these other markets were shorter-haul markets where higher load factors were not unusual. J.A. 193. Furthermore, the Board emphasized that the reliability of Eastern's proposal arose from the beyond-Atlanta operations. Noting that a carrier's incentive to provide a particular pattern of services over a new route depends essential-

---

**5.** The Board has held that need for economic strengthening may be controlling if the applicants' proposals are equal in all other aspects considered. *Northwest Airlines, Inc. Chicago-Milwaukee-New York Service,* 6 C.A.B. 217, 224 (1944).

**6.** More convenient timing and greater single-plane and single-carrier service also contributed to Eastern's superior service proposal.

ly on the relationship between the new route and other opportunities on the carrier's system, the Board found that the Fort Myers operation would be profitable and would integrate well with Eastern's system. *Id.* at 229. This is an area of predictive judgment, one peculiarly fit for the exercise of agency expertise and unfit for interference from the courts. *Frontier Air Lines, Inc. v. CAB, supra,* 142 U.S.App.D.C. at 130, 439 F.2d at 640; *see Greater Boston Television Corp. v. FCC, supra,* 143 U.S.App.D.C. at 392, 444 F.2d at 850. Delta also finds error in the Board's failure to make a comparative finding on the economic incentive factor. However, where it is properly determined that the selection of one of several qualified applicants is in the public interest on the basis of authorized decisional factors, no further findings with respect to unsuccessful applicants are required. *Eastern Airlines, Inc. v. CAB,* 271 F.2d 752, 760 (2d Cir. 1959), *cert. denied,* 362 U.S. 970, 80 S.Ct. 954, 4 L.Ed.2d 901 (1960). *See also Frontier Air Lines, Inc. v. CAB, supra,* 142 U.S.App.D.C. at 127 n. 4, 439 F.2d at 637 n. 4.

 Delta's third claim of error is that the Board failed to take into consideration the "comparative economic efficiency" factor. The Board mentioned the recent report of its Special Staff which *recommended* the *development* of this factor as an element in route cases. J.A. 194. However, the evolution of an appropriate standard for assessing and applying such a factor has not yet been developed. This fact, coupled with the absence from the record in this case of the relevant comparative data, led the Board to refuse to enter a comparative finding here. The Board's determination not to charter a new course in this adjudicatory proceeding was plainly reasonable.

 Delta's final argument is that this case is inconsistent with the previously decided *Reopened Service to Omaha and Des Moines Case,* Order 75–9–19 (September 8, 1975). The issues in the *Omaha/Des Moines Case* included whether competitive nonstop authority would be awarded between Omaha and Des Moines and the east and west coasts. The Board determined that such authority was required because the service offered in those markets by the incumbent United Air Lines, Inc. (United) was deficient. Due to United's complete entrenchment, the Board concluded that the carrier selected to compete against United would have to be awarded additional route authority to provide enough supporting traffic to make the competitive service in the coastal markets a viable proposition. Consequently, the competing applicants' actual frequencies and performance in beyond-segment markets were scrutinized. In the case at bar, Delta would have the Board examine for frequency and performance the so-called "top twenty" markets to show Delta's superiority. However, support traffic in those twenty markets was *not* crucial in selecting a nonstop Fort Myers-Atlanta carrier. Delta's general superiority in those twenty markets would not have negated the evidence that Eastern offered the best quantity and quality of service from Fort Myers to certain key midwest cities. In the *Omaha/Des Moines Case,* the awardee would be in competition with a strong, entrenched incumbent for the support traffic moving to Chicago and on to the east. This traffic was essential to profitable operation of Omaha/Des Moines service. However, in the monopoly nonstop authority awarded Eastern here, non-Fort Myers markets were not at issue.

## CONCLUSION

As we find that the Board's conclusion that the award to Eastern was (1) required by the public interest, convenience, and necessity, (2) supported by substantial evidence in the record, and (3) founded upon a rational basis, we affirm the Board's order.

*So ordered.*