John W. ALLISON, Jr., et al.,
Petitioners,

v.

DEPARTMENT OF TRANSPORTA-
TION, et al., Respondents,

City and County of Denver,
Intervenors.

No. 89-1721.

United States Court of Appeals,
District of Columbia Circuit.

Argued Jan. 29, 1990.
Decided Aug. 3, 1990.

Joel W. Cantrick, Denver, Colo., for petitioners.

Peter R. Steenland, Jr., Atty., Dept. of Justice, with whom Richard B. Stewart, Asst. Atty. Gen., Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C., Diane R. Liff, Bethesda, Md., Asst. General Counsel, Dept. of Transp., and Gregory S. Walden and Richard W. Danforth, Attys.,

F.A.A., Washington, D.C., were on the brief, for respondents.

Michael M. Conway, with whom Michael Schneiderman and Steven A. Levy, Chicago, Ill., were on the brief, for intervenors. John H. Spellman and Robert P. Fletcher, Washington, D.C., also entered appearances for intervenors.

Before MIKVA, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

This case concerns the Federal Aviation Administration's approval of a major new facility to replace Denver's Stapleton International Airport. Petitioners challenge the FAA's determination that the noise generated by the new airport would not constitute the "use" of a nearby state park and wildlife refuge under section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303 (1982 & Supp. V 1987). Although we find that the FAA erred by using inappropriate guidelines for measuring the effects of noise, we conclude that its determination that no use will be made of the refuge is nonetheless supported by substantial evidence. We also reject petitioners' various other claims under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347 (1982 & Supp. V 1987), and the Airport and Airway Improvement Act ("AAIA"), 49 U.S.C. App. §§ 2201–2227 (1982 & Supp. V 1987). We therefore deny the petition for review.

I. BACKGROUND

Stapleton International Airport, which is owned and operated by the City and County of Denver, is among the busiest airports in the country. For some time now, Stapleton has served as a hub airport for two major airlines and, more generally, as a major connecting point in the national air transportation system. Stapleton, however, has been considered inadequate in three respects: capacity, delays associated with its runway configuration, and noise resulting from the airport's location in an area surrounded by substantial residential and commercial development. In response to these problems, Denver has proposed the construction of a major new airport approximately thirteen miles northeast of Stapleton, to be followed by the permanent closure of Stapleton. The FAA has approved this proposal, granted Denver $60 million for the project, and agreed to take various other actions to assist the city in completing the airport. A brief history of the proposal and the FAA's approval follows.

In 1978, the Denver Regional Council of Governments undertook a study of potential sites for a new airport. In 1983, the Council recommended that Stapleton be expanded onto the Rocky Mountain Arsenal, a military reservation that adjoins Stapleton to the north. This recommendation encountered strong opposition from the public, particularly the citizens of communities adjacent to Stapleton and in western Adams County. In addition, the presence of hazardous waste contamination at the Arsenal gave rise to serious questions over the feasibility of this option.

Following another study in 1984, Denver identified a preferred site for the new airport in Adams County about thirteen miles northeast of Stapleton. Its findings were confirmed by a third study completed two years later. Denver and Adams County signed an intergovernmental agreement in April 1988 that authorized Denver to annex the land required for the airport. The following month, the citizens of Adams County approved the annexation; and one year later, Denver voters approved the proposed airport by nearly a two-to-one margin.

Meanwhile, in April 1988, Denver circulated a draft environmental assessment for public review. Following a series of public hearings and the consideration of comments, Denver issued a two-volume final environmental assessment in November 1988. *See* City and County of Denver, New Denver Airport Environmental Assessment (Nov. 1988) ("Denver EA"). The FAA provided Denver with guidance and oversight as to the content and accuracy of the information contained in the draft and

final assessments and assured that the study was coordinated with appropriate local, state, and federal agencies.

At the same time, as required by NEPA, 42 U.S.C. § 4332(2)(C), and the AAIA, 49 U.S.C. App. § 2208(b)(5), the FAA began work on its own study. In April 1988, the FAA published a notice of intent to prepare an environmental impact statement ("EIS"), and in June it held a meeting to receive the views of interested state, local, and federal agencies regarding the subjects and issues to be addressed in the EIS. 53 Fed.Reg. 15,481 (1988).

A draft EIS was released for comment on February 10, 1989. On March 15 the FAA conducted an open public hearing at which approximately forty-five speakers presented comments. Thereafter, the FAA extended the comment period twice and, predictably, received voluminous written comments on the draft EIS. Following various revisions, the FAA issued its Final Environmental Impact Statement ("FEIS") on August 8, 1989, and a notice of its availability was published on August 25. *See* U.S. Dep't of Transp., Final Environmental Impact Statement, New Denver Airport (Aug.1989); EIS Availability, 54 Fed. Reg. 35,388 (1989). In brief, this document addresses the purposes of and need for a new airport, examines possible alternatives to Denver's proposal, and weighs the environmental consequences of the project. It also responds to the oral and written comments received on the draft EIS.

On September 27, 1989, the Regional Administrator of the FAA's Northwest Mountain Region issued a Record of Decision ("ROD") pursuant to the AAIA, 49 U.S.C. App. § 2208, granting federal approval to the proposed airport and directing that various actions be taken by the FAA, such as the establishment of air traffic control procedures and a grant to Denver to help fund the project. U.S. Dep't of Transp., Record of Decision for the New Denver Airport (Sept.1989). On the same day the ROD was signed, the FAA granted Denver the $60 million.

Petitioners in this case are individuals who live in the community of Van Aire, a "residential airpark" development consisting of houses, aircraft hangars, taxiways, and a runway, located about five miles north of the site selected for the new airport. It appears that Van Aire will be unable to continue to operate as an airpark when the airport is completed. Petitioners now seek review of the FEIS, the ROD, and the grant pursuant to the Federal Aviation Act, 49 U.S.C. App. § 1486(a). They raise various challenges under section 4(f) of the Department of Transportation Act, NEPA, and the AAIA. In Part II–A we discuss the section 4(f) issue. In Part II–B we briefly address petitioners' remaining claims.

## II. DISCUSSION

### A. Section 4(f)

Section 4(f) declares it to be national policy that "special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303(a). To that end, the section provides as follows:

The Secretary [of Transportation] may approve a transportation program or project ... requiring *the use* of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance ... only if—

(1) there is no prudent and feasible alternative to using that land; and

(2) the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge ... resulting from the use.

*Id.* § 303(c) (emphasis added).

In the FEIS and the ROD, the FAA found that the new airport would "not involve the use of any" lands protected by section 4(f). FEIS at 5.36; ROD at 17–18. The FAA's discussion focused on Barr Lake State Park, a nearby recreational park and wildlife refuge, which the FAA identified as the only major recreational facility near the proposed airport. FEIS at 5.36.

Barr Lake State Park comprises 691 acres of land and a 1,900–acre man-made lake located several miles northeast of the new airport site. At the north end of the lake, sailboats, rowboats, and boats with electric trolling motors are permitted. The southern portion of the park is dedicated to its role as a wildlife refuge that is of particular interest to birders, who make use of its network of trails, boardwalks, viewing platforms, and observation blinds. *See* J. Perry & J. Perry, The Sierra Club Guide to the Natural Areas of Colorado and Utah 136–37 (1985). The park is a nesting place for at least one pair of bald eagles and is widely known for its waterfowl. Petitioners do not dispute that Barr Lake is the only land to which section 4(f) potentially applies.

In explaining its finding, the FAA stated, first, that "[n]oise impacts at the park from operation of the proposed new airport have been shown to be well below the level of significance according to Federal guidelines," FEIS at 5.36, and second, that the "expected noise levels from the new airport are not significantly different than those experienced from operations at Stapleton." FEIS at 10.153. The FAA concluded that the anticipated noise impacts would not constitute a " 'taking or use of' " Barr Lake State Park and, accordingly, that section 4(f) would not be applicable. FEIS at 5.36. The FAA did not discuss whether impacts of any other kind might "use" the park, although its conclusion was that the airport would make *no* use of section 4(f) lands.

■ Petitioners assert that the FAA's analysis was flawed. In particular, they contest the noise guidelines relied on by the FAA as inappropriate for a wildlife refuge. They also submit that the record amply indicates that the new airport will "use" Barr Lake not only in terms of noise, but also in terms of air pollution and various other unspecified impacts resulting from secondary development. As we find nothing in the record to support these latter contentions, we will limit our discussion to the issue of airport-generated noise.

The "use" of parklands within the meaning of section 4(f) includes not only actual, physical takings of such lands but also significant adverse indirect impacts as well:

[A] project which respects a park's territorial integrity may still, by means of noise, air pollution and general unsightliness, dissipate its aesthetic value, crush its wildlife, defoliate its vegetation, and "take" it in every practical sense.

*D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1239 (D.C.Cir.), *cert. denied*, 405 U.S. 1030, 92 S.Ct. 1290, 31 L.Ed.2d 489 (1972); *see also Adler v. Lewis*, 675 F.2d 1085, 1092 (9th Cir.1982). At the same time, "not ... every change within park boundaries constitutes a use" of section 4(f) lands. *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 63 (D.C.Cir.1987). No "use" will be deemed to have occurred where an action will have only an insignificant effect on the existing use of protected lands. *See Sierra Club v. United States Dep't of Transp.*, 753 F.2d 120, 130 (D.C. Cir.1985).

In concluding that the noise that would be produced by the new airport would not constitute a "use" of Barr Lake State Park, the FAA explained that the anticipated noise would be "well below the level of significance according to Federal guidelines." FEIS at 5.36. These guidelines are FAA regulations for "Airport Noise Compatibility Planning," which identify certain land uses that are "normally compatible with various levels of exposure to noise by individuals." 14 C.F.R. § 150.1 (1990); *see id.* Part 150; FEIS at 5.36, 8.1, 10.153. A table appended to the regulations identifies five subcategories within the "Recreational" category of land uses. These include "Nature exhibits and zoos," "Amusements, parks, resorts and camps," and "Golf courses, riding stables and water recreation." 14 C.F.R. Part 150 app. A, Table 1.

The regulations specify the levels of noise that are compatible with each category of use. These are stated in terms of yearly day-night average sound levels measured in decibels, or "Ldn." In referring to the Part 150 guidelines in its section 4(f) analysis, the FAA explained that

[r]ecreational uses including nature exhibits, parks and golf courses are identified in this table as compatible up to Ldn levels of 70–well above those levels predicted in the EIS for the Barr Lake area.

FEIS at 10.153. The implicit conclusion, of course, is that because those particular recreational uses are compatible with certain noise levels, the prevalence of any lesser average levels at Barr Lake would not amount to a "use" of the park.

The problem with this analysis is that the effect of noise on the types of land uses specified in the regulations bears little or no relation to the effect of noise on the park's role as a refuge and on those who visit it to study and enjoy its wildlife. Given the avowed policy of section 4(f) to preserve the "natural beauty" of wildlife refuges and other parklands, 49 U.S.C. § 303(a), agencies must consider the effects of an action on the *natural* attributes of those lands in making its section 4(f) determinations. Yet by focusing, as they explicitly do, on the "reaction of *people* to noise," *see* 14 C.F.R. § 150.1 (emphasis added), the regulations relied on by the FAA neglect altogether the effects of noise on *wildlife* and the natural environment generally. Although the FAA argues in its brief that studies on the reaction of animals to aircraft noise have been inconclusive at best, such reasoning appears nowhere in the agency's section 4(f) findings.

Moreover, because Part 150 does not list wildlife refuges among the land use categories to be protected, it is of little use in addressing the effects of noise on the expectations and purposes of persons who visit Barr Lake to study and enjoy its wildlife. These purposes have little in common with the recreational uses associated with "nature exhibits, parks and golf courses" with which the FAA compared Barr Lake in its FEIS. *See* FEIS at 10.153. While these subcategories may be appropriate guides to acceptable noise levels over those areas of Barr Lake State Park that are devoted to traditional recreational uses such as boating, they are irrelevant to the park's other role as a refuge.

The incongruity of these comparisons is especially apparent when one looks at the subcategories on which the FAA relies. In these, "nature exhibits" is paired with "zoos," "parks" is sandwiched between "amusements" and "resorts," and "golf courses" is grouped with "water recreation." 14 C.F.R. Part 150 app. A, Table 1. The tolerance of people to noise at zoos, amusement parks, and resorts cannot lead to any meaningful conclusion about the noise levels that are appropriate for a wildlife refuge. In sum, none of these subcategories is relevant to the values typically associated with the use of a wildlife refuge, such as tranquility and the opportunity to observe nature undisturbed by human activity. While it is reasonable for the agency to rely on guidelines in determining whether a "use" of section 4(f) lands has occurred, they must bear some relevance to the value, significance, and enjoyment of the lands at issue.

■ Nevertheless, the FAA's error in relying on the Part 150 guidelines is not fatal. The Administrative Procedure Act provides that in judicial review of agency action, "due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706 (1988). We have described the appropriate inquiry as follows:

[W]here a subsidiary finding is unsupported or otherwise erroneous but the court is clear that its presence was not material to the ultimate finding, reversal is inappropriate. The court should affirm if it appears all the important basic findings made by the [agency] are supported by substantial evidence. A court should not upset a decision because of errors that are not material....

*Delta Air Lines, Inc. v. CAB*, 564 F.2d 592, 598 (D.C.Cir.1977) (citations omitted); *see also Road Sprinkler Fitters Local Union No. 669 v. NLRB*, 778 F.2d 8, 14 (D.C.Cir. 1985).

■ Under these principles, we conclude that the FAA's use of inappropriate noise guidelines is not prejudicial because there is substantial evidence in the FEIS to support its determination that Barr Lake State Park will not be "used." To explain our

conclusion, we refer again to the legal standard for what constitutes a "use." As we explained above, section 4(f) will not be invoked where the activity complained of will have only an insignificant effect on the existing use of the parkland. *See Sierra Club*, 753 F.2d at 130; *cf. Ringsred v. Dole*, 828 F.2d 1300, 1303 (8th Cir.1987) (describing *"increased* noise levels" as a "use" under section 4(f)) (emphasis added).

In *Sierra Club* we considered whether permitting commercial jets to land at an airport in Grand Teton National Park would constitute a "use" of parklands under section 4(f). The FAA had found that the increase in cumulative noise would not be significant. Observing that the airport had been used for many years by commercial propeller planes and private jets, we concluded that the addition of commercial jets would result in only "relatively minor changes in the operational characteristics of an established transportational facility" and held that such flights would not be a "use" for purposes of section 4(f). *Sierra Club*, 753 F.2d at 130; *see also Coalition on Sensible Transp., Inc.*, 826 F.2d at 63 (discussing *Sierra Club* with approval).

Although the case before us, unlike *Sierra Club*, involves a *new* airport, the FAA concluded at several points throughout the FEIS that the anticipated impact on Barr Lake of the noise created by the new airport would generally be about equal to, or lower than, that currently produced by the operations at Stapleton. *See, e.g.,* FEIS at 10.67 ("A lower percentage of departures in a northerly direction will generally result in a lower cumulative noise impact upon Barr Lake State Park activities."); *see also id.* at 6.3 ("The anticipated noise levels [at Barr Lake] are ... below current levels."); *id.* at 10.153 ("The expected noise levels from the new airport [at Barr Lake] are not significantly different than those experienced from operations at Stapleton.").

This conclusion is supported by the FAA's "noise contour diagrams," which depict lines of equal exposure to noise as measured by Ldn (the average day-night index used to describe cumulative noise impacts). The diagrams comparing the projected noise levels generated by the continued use of Stapleton with those generated by the new airport for the years 1995 (when the first phase of construction would be completed) and 2020 (when the project would be finished) show that under all the scenarios, Barr Lake State Park will remain well outside the Ldn 60 noise contour, which is the minimum level shown on the diagrams. These indicate that at this level, there is no significant difference in the impact on Barr Lake of the noise resulting from operations at the two airports. *See* FEIS at 5.5, 5.5a, 5.8, 5.11. Petitioners have nowhere suggested that significant differences between noise levels caused by Stapleton and the new airport would arise if lower Ldn contours had been charted.

The FAA's conclusion that the new airport will not involve a section 4(f) use is further supported by data measuring episodic (as opposed to average) noise levels at Barr Lake. In its FEIS, the FAA presents data derived from the Denver EA showing the number of minutes per day during which the noise level at three locations around Barr Lake State Park would exceed 75 dBA (the equivalent of a household vacuum cleaner operating five to six feet away). *See* FEIS at 5.16–5.17. At two of the locations, the minutes of such noise exposure resulting from the new airport on the completion of its first phase in 1995 are only 0.1 minutes each, well below the 2.5 and 1.6 minutes that would result from continued operations at Stapleton. FEIS at 5.17. At the third location—which is at the easternmost edge of the park—the new airport would generate 4.7 minutes a day of noise in excess of 75 dBA in 1995, as compared to 1.2 minutes a day from Stapleton.

Moreover, our own examination of the underlying data contained in the Denver EA supports the trend illustrated by the FEIS—a general decline in peak noise from the new airport, with but one other exception worth noting. At one location just beyond the park's northeast boundary, the new airport would generate 5.1 minutes a day of noise above 75 dBA in 1995, compared with zero minutes a day from Stapleton. *See* Denver EA at Appendix A. The

question, then, is whether these projected increases of 3.5 and 5.1 minutes a day above the levels expected from Stapleton at two peripheral locations result in a sufficiently substantial adverse impact on Barr Lake to constitute a "use" under section 4(f). On the basis of *Sierra Club*, and considering the other evidence indicating *an overall decrease* of noise over Barr Lake when the new airport becomes operational, we find that they do not.

We conclude from the above that in spite of its mistaken reliance on the noise level guidelines contained in its regulations, the FAA has marshaled sufficient evidence to support its conclusion that the operation of the new airport will not result in a significant increase in noise levels at Barr Lake State Park, and therefore it will not give rise to a use of the park under section 4(f).

## B. Petitioners' Other Claims

Petitioners contend that the FAA failed adequately to consider a reasonable range of alternatives to the proposed airport, as required by NEPA, Council on Environmental Quality ("CEQ") regulations, and the AAIA. *See* 42 U.S.C. § 4332(2)(C)(iii), (E) (1982); 40 C.F.R. § 1502.14 (1989); 49 U.S.C. App. § 2208(b)(5) (1982). Petitioners also assert that the FAA failed to analyze the cumulative impact of the proposed airport together with the impacts of other planned but unrelated projects in the area, in violation of applicable CEQ regulations. *See* 40 C.F.R. §§ 1508.7, 1508.25 (1989). Lastly, they claim that the interests of the Van Aire community have not received fair consideration, as required by the AAIA. *See* 49 U.S.C. App. § 2208(b)(4).

We deny review on these claims. First, the FEIS contains abundant evidence that the FAA carefully considered a reasonable range of alternatives. *See, e.g.,* FEIS at 3.1–3.41, 10.51–10.62; *see also* ROD at 3–7. The FAA need not examine an infinite number of alternatives in infinite detail. *See, e.g., NRDC, Inc. v. Hodel,*

865 F.2d 288, 294–95 (D.C.Cir.1988) (consideration of alternatives to be guided by "rule of reason" and "bounded by some notion of feasibility"). Second, the FAA gave adequate attention to the effects of such contemplated airport-related projects as the construction of access roads. *E.g.,* FEIS at 5.23–5.29, 10.77–10.88, 10.124–10.126. It is not required by the pertinent CEQ regulations to consider projects that are neither related to nor dependent on the airport. *See* 40 C.F.R. § 1508.25(a) ("unconnected single actions" need not be considered); *Kleppe v. Sierra Club,* 427 U.S. 390, 409–12, 96 S.Ct. 2718, 2729–31, 49 L.Ed.2d 576 (1976). Finally, our examination of the FEIS satisfies us that the FAA fairly and adequately considered the interests of the Van Aire community, and petitioners present no evidence to the contrary. *See* FEIS at 5.20–5.23, 10.57, 10.74–10.75; *see also* ROD at 8.

## III. CONCLUSION

In making its section 4(f) determination, the FAA erred to the degree that it relied on guidelines that failed to measure the effects of noise both on the natural environment of Barr Lake State Park and on the expectations of visitors to the refuge. Nonetheless, its conclusion that the new airport will not constitute a "use" of section 4(f) lands is supported by substantial evidence that the noise levels produced by its operations will add only insignificantly, if at all, to those presently experienced over the park. As we find petitioners' remaining claims to be without merit, the petition for review is

*Denied.*